UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEXTER HARRIS,

            Plaintiff,

      v.

PACIFIC GAS & ELECTRIC COMPANY, et al.,

            Defendants.

Case No.  21-cv-04096-JCS

**ORDER GRANTING IN PART:**

1) **ERA AND WORLEY'S MOTION TO COMPEL ARBITRATION AND DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(B)(1), 12(B)(3) AND 12(B)(6); AND**
2) **PG&E'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. Nos. 46, 47

## I.      INTRODUCTION

Plaintiff Dexter Harris brings employment discrimination claims under Title VII and California law against Worley Group Inc. ("Worley"), Energy Resourcing America, Inc. ("ERA") and Pacific Gas & Electric ("PG&E"), as joint employers.  All three defendants contend Harris's claims are subject to binding arbitration pursuant to an arbitration provision in an independent contractor agreement ("IC Agreement") between Harris's company – Saint Jude Design Engineering Procurement and Construction Project Management LLC of Baker, Louisiana ("Saint Jude") – and ERA.  They also seek dismissal of Harris's claims on the basis that they are insufficiently pled.  Presently before the Court are the following motions:  1) Worley and ERA's Motion to Compel Arbitration and Dismiss Plaintiff's Second Amended Complaint Pursuant to FRCP 12(b)(1), 12(b)(3) and 12(b)(6) ("Worley/ERA Motion"); and 2) PG&E'S Motion to Dismiss Second Amended Complaint ("PG&E Motion").  A hearing on the Motions was held on August 26, 2022, and the parties submitted supplemental briefs and evidence following that

1    hearing.  The Court finds that no further hearing is necessary and therefore vacates the hearing set

2    for December 2, 2022 pursuant to Civil Local Rule 7-1(b). The Case Management Conference set

3    for the same date is also vacated.   For the reasons stated below, the Court finds that all of Harris's

4    claims are subject to arbitration and therefore GRANTS the Worley/ERA Motion and the PG&E

5    Motion on that issue; it does not reach the remaining challenges in Defendants' motions.[1]

6    ## II.    BACKGROUND

7    ### A.  The Second Amended Complaint

8         In the Second Amended Complaint ("SAC"), which is the operative complaint, Harris

9    names three defendants:   ERA and Worley, which are alleged to be foreign companies "doing

10   business in California including in this District[;]" and PG&E, which is alleged to be "a California

11   corporation with headquarters and facilities within this District."  SAC ¶¶ 14-16.  Harris alleges

12   that he is "a black male" and a "resident of the State of Louisiana." *Id.*  ¶ 13.  He further alleges

13   that he is "a former employee of Defendants." *Id.*  He makes the following general allegations in

14   the introduction of his complaint:

15             1.This is an employment discrimination case, brought pursuant to the
               provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.
16             §§2000e, et seq., as amended ("Title VII") and Fair Employment &
               Housing Act ("FEHA"), California Gov. Code § 12900, et seq.

17             2. Plaintiff is a black male. Plaintiff alleges that Defendants have
               discriminated and retaliated against him based on his race and have
18             wrongfully terminated his employment.

19             3. Defendants hired Plaintiff to perform high voltage energy
               transmission inspections and other related work in California.
20
               4. Plaintiff was the only black male in his group.
21
               5. Defendant is a highly skilled professional in his area of expertise.
22             He was one of the top inspectors while working for Defendants.

23             6.    Defendants,    however,    consistently    and    systematically
               discriminated against Plaintiff based on his race.
24
               7. Defendants purposely held up Plaintiff's salary payments.
25
               8. When Plaintiff complained, Defendants falsely accused Plaintiff of
26             work performance-related failures and terminated his employment.

27   _____

28   [1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28
     U.S.C. § 636(c).

2

The stated bases for Plaintiff's termination were entirely fabricated.

*Id.* ¶¶ 1-8.

The SAC also contains a "Fact" section alleging specific facts. In that section, Harris alleges that "[o]n March 26, 2020, [ERA], a recruitment provider for [Worley], hired [him] as a Project Manager to perform high voltage energy transmission inspections and other related work for Worley and [PG&E] in California." *Id.* ¶ 22. Harris "started work effective April 20, 2020." *Id.* ¶23. According to Harris, this was not his "first experience doing projects for PG&E" and "[o]n prior assignments, Mr. Harris was frequently the subject of racial slurs by various PG&E contract employees." *Id.* ¶ 24. He alleges that "[h]is experience was particularly bad while working for PG&E in 2019" and describes four specific incidents involving racial discrimination or harassment that occurred in 2019. *Id.* ¶¶ 25-28.

Harris alleges that while working for PG&E, "co-workers, including PG&E agents and/or employees who, either officially and/or in effect, had supervisory and/or managerial authority over Mr. Harris, referred to him as 'Johnny on the spot here smart nigga'" on a "daily" basis and that "Defendants' supervisors and management personnel knew of this practice but did nothing to stop it." *Id.* ¶ 30. He further alleges that "Defendants' personnel, including Plaintiff's supervisors/ managers, singled Plaintiff out for how he looked, dressed, conducted himself, and for the new truck that he drove" and "were, apparently, upset with the fact that a Black man amongst them was well-educated, well-dressed, carried himself with confidence, and drove a nice truck." *Id.* According to Harris, "they called Plaintiff 'an enigma' to his face." *Id.*

Plaintiff describes in the SAC a series of incidents that led up to his termination, on August 26, 2020. *Id.* ¶¶ 32-55. Some of these related to Harris's inspection of PG&E equipment and a "major issue" that "Jeff Edgerly" had with Harris's insistence on "following the Institute of Electrical and Electronics Engineers ('I.E.E.E.') standards[,]" which "Mr. Harris insisted . . . required at least one grounding per structure and, depending on the size or load, possibly two grounding mechanisms." *Id.* ¶ 33. According to Harris, Edgerly told him "in no uncertain terms, that PG&E was only concerned with having one grounding mechanism per every fourth or fifth structure" and that Harris's inspections "must reflect that quota" or his "inspections would be

3

considered a failure and his daily inspection total would be reset." *Id.* ¶ 34.  Harris alleges that Edgerly also commented that he was "too smart for his own good." *Id.*  Harris further alleges that "[o]n multiple occasions during the spring of 2020, Mr. Edgerly criticized [his] work, claiming he was not abiding by certain stipulations of the PG&E Transmission Line Inspection Aid handbook" even though that handbook "was not altered to include those stipulations until August 5, 2020." *Id.* ¶ 35.

Harris alleges that "[o]n July 1, 2020, [Subject Matter Expert ('SME')] Mike Padilla unlabeled a structure that Mr. Harris had previously, and correctly, identified as an A-tag – an emergency designation, requiring immediate response and repair of the structure." *Id.* ¶ 36.

Harris alleges that on July 7, 2022, "PG&E effectively silenced [him] for voicing his concerns by moving him to a different department where he would no longer be involved with inspections." *Id.* ¶ 37.  In particular, he was moved to the Centralized Inspection Review Team ("CIRT"), "which reviews priority tag designations, amongst other things." *Id.*

Harris alleges that "[o]n August 26, 2020, at 5:00 p.m., Mr. Harris, Mr. Issam El Ayadi,[2] Mrs. Rosa Serrano, and Mr. Jamie Ortiz[3] all attended a mandatory Microsoft Teams meeting" where "Mr. El Ayadi claimed" that during a May 11, 2020 inspection that Harris had conducted Harris had "failed to label the structure with an A-tag" and that "this was unacceptable." *Id.* ¶¶ 39-40.  According to Harris, "Mr. El Ayadi asked Mr. Ortiz to present a photo display of slides showing the structure and to point out the reasons why the A-tag label would be required" but "Mr. Harris believes the photos were doctored." *Id.* ¶ 41.  Also at the meeting, "Ms. Serrano claimed that Mr. Harris was 'the AIR Team Plus/CIRT team member with the most mistakes upon

---

[2] Although Ayadi's affiliation is not stated in the SAC, in the DFEH charge attached to the SAC he is described as "of PG&E." *See* dkt. no. 41 at ECF p. 41. Ayadi supplied a declaration in support of Defendants' supplemental briefing in which he states that he has been employed by PG&E since January 2018 and that his current job title is Sr. Manager, Electric Transmission Asset Strategy.  Ayadi Decl. (dkt. 67-2) ¶ 1.

[3] Although Ortiz's affiliation is not stated in the SAC, in the EEOC charge attached to the SAC he is described as "the transmission line inspection supervisor for P.G.& E." *See* dkt. no. 41 at ECF p. 46. Ortiz supplied a declaration in support of Defendants' supplemental briefing in which he states that he has been employed by PG&E since May of 2015 and that during the time period from late April 2020 to September 2021, his job title was Aerial & Specialized Inspections Supervisor. Ortiz Decl. (dkt. 67-3) ¶ 1.

United States District Court
Northern District of California

review'" but when "Mr. Harris inquired as to who performed the review and what errors were found [he] was given no information or answers." *Id.* ¶ 46.  Furthermore, Harris alleges, "Quinton Beams (Mr. Harris' direct supervisor) had said earlier that day that Mr. Harris was months ahead of the norm" – a statement that "cannot be reconciled with [Ms. Serrano's] contention that Mr. Harris' work was error filled." *Id.*

At the meeting, Harris was instructed to "speak with Mansour Pourcyrous[4] with regards to 'the final outcome of these findings.'" *Id.*   Harris alleges that "[t]he subject of termination was not discussed during the meeting." *Id.* According to Harris, he left two voicemail messages for Pourcyrous, who called Harris back and told him that he "had no idea what was going on, that he would have to call PG&E, and that he would call back to explain everything later – despite the fact that Mr. Pourcyrous was involved himself in organizing the meeting." *Id.*  ¶ 49.  Later the same day, Mr. Pourcyrous called Harris and told him that "his services were no longer needed." *Id.* ¶ 50.  Harris alleges that "[n]o reasons were provided for the termination." *Id.*

Harris alleges that "[i]n a September 1, 2020, email to Mr. Pourcyrous, Mr. Ortiz claim[ed] he had multiple performance meetings with Mr. Harris 'to try and improve his inspections quality'" but that these were actually "meetings that Mr. Harris initiated to discuss software issues that interfered with his inspection duties and erroneous quota numbers that showed he had been averaging 7 structure inspections a day when he had been completing an average of 14 a day – well above his quota of 10." *Id.*  ¶ 51.  Harris further alleges that "[o]n multiple occasions prior to the August 26 meeting, Mr. Edgerly obstructed and penalized Mr. Harris' work, despite Mr. Harris' strict adherence to protocols[,]" which Harris believes was "motivated by Mr. Edgerly's desire to have him fired for discriminatory and retaliatory reasons." *Id.* ¶ 52.

Harris alleges that he "perceived that the August 26 meeting held to question his work after so much time had passed, and Mr. El Ayadi's statements during the meeting, were for the purpose of building a pretextual case against him to justify his termination." *Id.* ¶ 53.  He further alleges that when he "complained of the above-described situation to management, Defendants retaliated

---

[4] Although Pourcyrous's affiliation is not stated in the SAC, he is described as a Worley project manager in the DFEH charge attached to the SAC.  *See* dkt. no. 41 at ECF p. 41.

1    falsely accusing Plaintiff of work-related mistakes, and terminated his employment on August 26,

2    2020." *Id.* ¶ 55.

3         Based on these alleged facts, Harris asserts six claims, all of which he asserts against all

4    three defendants:  1) race discrimination and retaliation under Title VII, 42 U.S.C. § 2000e

5    ("Claim One"); 2) race discrimination under California's Fair Employment and Housing Act

6    ("FEHA"), Cal. Gov't. Code section 12940 ("Claim Two"); 3) harassment and failure to take

7    reasonable steps to prevent harassment under FEHA, Cal. Gov't. Code section 12940 ("Claim

8    Three");[5] 4) retaliation under FEHA ("Claim Four"); 5) retaliation under the Federal False Claims

9    Act, 31 U.S.C. §§ 3729 *et seq.* ("Claim Five"); 6) retaliation under the California False Claims

10   Act, Cal. Gov't. Code sections 12650 *et seq.* ("Claim Six").

11        Harris also alleges that he exhausted his administrative remedies as to his Title VII and

12   FEHA claims, SAC ¶¶ 19-21, and attaches his EEOC and DFEH charges to the SAC.

13   **B.    The IC Agreement**

14        The IC Agreement is attached as Exhibit A to the Declaration of Julie Booth in support of

15   the ERA/Worley Motion.[6]   Under the IC Agreement, ERA agreed to "contract to the

16   CONTRACTOR certain technical services contracts" and the "Contractor" agreed to "perform the

17   services in accordance with the terms of [the] Agreement."  IC Agreement ¶¶ 1 & 2. The IC

18   Agreement provides that ERA will provide workers' compensation insurance coverage for the

19   period when the Contractor is performing services for the "Client" but specifies that the

20   "Contractor" is not an ERA employee. *Id.*  ¶¶ 2, 3 & 6. It further provides that the "Contractor"

21   "shall function within the Client's organization per the established administrative procedures of

22   the Client's organization" and that "[a]ll matters concerning the technical aspects of the work will

23

24   [5] Claims Two and Three both refer to harassment and failure to prevent harassment; the Court has
     attempted to distinguish between the claims based on the names given to the claims in the SAC
     but is forced to guess which theories are being asserted in these claims.

25   [6] Another version of the IC Agreement is attached to Harris's DFEH charge, which Harris
     supplied as an exhibit to his complaint. That version is dated March 26, 2020 and is unsigned. The

26   arbitration provision is the same in both versions. At the August 26, 2022 motion hearing, Harris's
     counsel stipulated that the version attached to the Booth Declaration is the one Harris actually

27   signed and that the one attached to the DFEH charge was an earlier draft of the agreement.
     August 26, 2022 Transcript (dkt. 66) at 6.  Therefore, the Court treats the version of the agreement

28   attached to the Booth Declaration as the operative agreement.

be addressed through and under the direction and control of the Client's designated Project Representative." *Id.* ¶ 4.  The IC Agreement further provides that ERA "shall exercise no direction or control, nor shall it have the right to exercise any direction or control over the details, means or methods by which CONTRACTOR performs any services for Client . . . and CONTRACTOR shall look solely to Client for all matters pertaining thereto." *Id.* ¶ 7.  It specifies that "[n]othing herein requires the CONTRACTOR to report anything other than invoicing information directly to [ERA] . . . ."  *Id.* The IC Agreement provides that the Contractor would submit "client approved timesheets" to ERA, which would pay the Contractor according to a fee schedule attached to the IC Agreement.  *Id.* ¶ 8.

The IC Agreement provides that "[i]n no event shall [ERA], Client or their affiliates be liable for any special, punitive or consequential damages" and that the Contractor's "remedies are limited as expressly set forth herein."  *Id.* ¶ 14.  The paragraph that follows addresses choice of law and arbitration, stating as follows:

> 15. This Agreement shall be construed and interpreted in accordance with the laws of the state of Texas except for its conflict of law's provisions. In the event of any dispute related to or arising from this Agreement, its performance, the Parties shall attempt in good faith to resolve disputes arising from or related to the performance, procedures, or management of this Agreement by referring the dispute to a senior management representative from each party to meet at a mutually agreeable time and place to attempt in good faith to arrive at a resolution. In the event such representatives are unable to resolve the matter with 14 days of first meeting, then either party upon written notice may refer the dispute, controversy or claim arising out of or relating to this Agreement, including any question regarding its existence, validity or termination to arbitration under the American Arbitration Rules and the situs shall be Houston, Texas. The decision of the arbitrator shall be final and binding on the parties, and the judgment upon the award rendered by the arbitrator shall be enforceable in any court of competent jurisdiction. Each party shall bear its own legal fees, costs, and expenses incurred in such arbitration.

*Id.* ¶ 15.

### C.   The Motions

#### 1.  The Worley/ERA Motion

ERA and Worley challenge Harris's complaint on three grounds.  First, they contend the arbitration provision in the IC Agreement is binding and enforceable and divests the Court of

United States District Court
Northern District of California

subject matter jurisdiction as to Harris's claims against ERA and Worley.  For this reason, they

contend Harris's claims against them should be dismissed under Rules 12(b)(1) and 12(b)(3) of

the Federal Rules of Civil Procedure.  Worley/ERA Motion at 1-2, 5-8.  Second, they argue that

Harris has failed to plead sufficient facts to state any claim against Defendants upon which relief

can be granted and therefore, that his claims must be dismissed under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  *Id.* at 2, 8-19.  Finally, they contend Claim One should be dismissed

because it improperly combines Harris's race discrimination and retaliation claims into one count,

in violation of Rule 10(b) of the Federal Rules of Civil Procedure. *Id.*  at 19-20.

### 2.  The PG&E Motion

Like ERA and Worley, PG&E argues in its motion that all of Harris's claims should be

dismissed under Rules 12(b)(1) and 12(b)(3) because they are subject to arbitration.  PG&E

further asserts that Harris's claims should be dismissed under Rule 12(b)(6) because they are

insufficiently pled.

### 3.  Harris's Opposition

Harris opposes both motions, arguing that the arbitration provision in the IC Agreement is

unenforceable and unconscionable.  He also argues that he adequately pled all of his claims based

on his status as a joint employee of the three defendants, and that he did not violate Rule 10(b)

because combining his retaliation and discrimination claims into a single claim does not create

confusion.

III.    WHETHER PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION

   A.   Legal Standards

      1.  Rule 12(b)(1)[7]

Although section 4 of the Federal Arbitration Act provides for the filing of a motion to compel arbitration, courts have held that a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "is a procedurally sufficient mechanism to enforce [an] [a]rbitration [p]rovision." *Filimex, L.L.C. v. Novoa Investments, L.L.C.*, No. CV 05–3792–PHX–SMM, 2006 WL 2091661, at *2 (D.Ariz. July 17, 2006) (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001) (holding that as long as the party made clear that it was seeking enforcement of the arbitration clause in its motion to dismiss, it had sufficiently "invoke[d] the full spectrum of remedies under the FAA")). Rule 12(b)(1) is appropriate for dismissing claims subject to arbitration because it "is a flexible rule" that often serves as a vehicle for raising residual defenses and the Federal Arbitration Act requires only that a party "petition" the court for an order directing arbitration to proceed. *Id.*

A party challenging the court's subject matter jurisdiction under Rule 12(b)(1) may bring a facial challenge or a factual challenge. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In evaluating a facial challenge to subject matter jurisdiction, the court accepts the factual allegations in the complaint as true. *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001). "When a defendant factually challenges the plaintiff's assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint." *Wolff v. Tomahawk Mfg.*, No. 3:21-CV-880-SI, 2022 WL 377926, at *1 (D. Or. Feb. 8, 2022)

---

[7] Defendants ERA and Worley suggest that Rule 12(b)(3) of the Federal Rules of Civil Procedure, permitting dismissal based on improper venue, may apply to their motion to the extent they seek to enforce an arbitration provision, though they do not cite to any specific authority. *See* ERA/Worley Motion at 6. The Supreme Court has held that "Rule 12(b)(3) allow dismissal only when venue is 'wrong' or 'improper[,]'" which "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws[.]" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013). The existence of a binding arbitration agreement does not establish improper venue under Rule 12(b)(3) and therefore, that rule does not apply here. *See Milliner v. Bock Evans Fin. Couns., Ltd.*, 114 F. Supp. 3d 871, 876 (N.D. Cal. 2015) (holding that motion to dismiss based on arbitration provision was not properly brought under Rule 12(b)(3)).

United States District Court
Northern District of California

1    (citations omitted). Once the moving party has made a factual challenge by offering affidavits or

2    other evidence to dispute the allegations in the complaint, the party opposing the motion must

3    "present affidavits or any other evidence necessary to satisfy its burden of establishing that the

4    court, in fact, possesses subject matter jurisdiction." *McCarthy v. Brennan*, No. 15-CV-03308-

5    JSC, 2017 WL 386346, at *5 (N.D. Cal. Jan. 27, 2017) (quoting *St. Clair v. City of Chico*, 880

6    F.2d 199, 201 (9th Cir. 1989)).

### 2.   The Federal Arbitration Act

8          Under the Federal Arbitration Act ("FAA"), a "written provision in . . . a contract

9    evidencing a transaction involving commerce to settle by arbitration a controversy thereafter

10   arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save

11   upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

12   Because arbitration is a matter of contract, the question of arbitrability, that is, "whether the parties

13   have submitted a particular dispute to arbitration[,]" is, "'an issue for judicial determination

14   [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter*

15   *Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *AT & T Technologies, Inc. v. Communications*

16   *Workers*, 475 U.S. 643, 649 (1986)).   The court's role in addressing a question of arbitrability is

17   "limited to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether

18   the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207

19   F.3d 1126, 1130 (9th Cir. 2000).

20         The FAA "was created to counter prevalent judicial refusal to enforce arbitration

21   agreements . . . and has been interpreted to embody 'a liberal federal policy favoring arbitration.'"

22   *Mortenson v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) (quoting *Moses H.*

23   *Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and citing *AT&T Mobility*

24   *LLC v. Concepcion*, 563 U.S. at 339). Thus, the Supreme Court has held that "any doubts

25   concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the

26   problem at hand is the construction of the contract language itself or an allegation of waiver,

27   delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24–25.

28         Nonetheless, "[a]rbitration is strictly a matter of consent and thus is a way to resolve those

United States District Court
Northern District of California

10

1    disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Granite*

2    *Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks omitted).

3    Consequently, courts may apply the "presumption favoring arbitration . . . only where it reflects,

4    and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what

5    the parties intended because their express agreement to arbitrate was validly formed and . . . is

6    legally enforceable and best construed to encompass the dispute." *Id*. at 303.

7         Although the Federal Arbitration Act governs the enforcement of an arbitration clause,

8    "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability),

9    courts generally . . .  should apply ordinary state-law principles that govern the formation of

10   contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  However, the

11   Court has "added an important qualification, applicable when courts decide whether a party has

12   agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed

13   to arbitrate arbitrability unless there is "clear[ ] and unmistakabl[e]" evidence that they did so."

14   *Id*. (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 649 (1986) ("Unless

15   the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed

16   to arbitrate is to be decided by the court, not the arbitrator.")).

17        **B.   Whether Harris's Claims Against ERA are Subject to Arbitration**

18        Harris does not dispute that he entered into the IC Agreement with ERA but argues that the

19   Court should not compel arbitration of his claims against ERA for two main reasons.   First, he

20   argues that the arbitration provision is procedurally and substantively unconscionable under

21   California law, and thus unenforceable.  Second, he argues that the IC Agreement did not delegate

22   this question to the arbitrator because the purported delegation clause is both unclear and itself

23   unconscionable. Because the Court will reach the first argument only if it determines that there is

24   no enforceable delegation clause, the Court begins by examining the enforceability of the

25   delegation clause.

26             a.   Whether Delegation Provision is Enforceable

27        As discussed above, delegation of the issue of arbitrability to the arbitrator must be clear

28   and unmistakable.  *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. at

United States District Court
Northern District of California

649. "Even if a delegation of arbitrability is clear and unmistakable it may be found unenforceable if the delegation itself is unconscionable." *Saravia v. Dynamex, Inc*., 310 F.R.D. 412, 419 (N.D. Cal. 2015) (citing *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 71–74 (2010)).

### i.   Is it "Clear and Unmistakable"?

The delegation clause in the IC Agreement's arbitration clause is found in the following sentence, in Paragraph 15:

> In the event such representatives are unable to resolve the matter with[in] 14 days of first meeting, then either party upon written notice may refer the dispute, controversy or claim arising out of or relating to this Agreement, *including any question regarding its existence, validity or termination* to arbitration under the American Arbitration Rules and the situs shall be Houston, Texas.

IC Agreement ¶ 15 (emphasis added).  Harris contends this language is "vague and amorphous," and argues that this "grammatically troubled phrase, packed into a sentence about demanding arbitration" does not clearly and unmistakably delegate issues of arbitrability to the arbitrator because "[i]t refers to disputes about the 'existence, validity or termination' of 'this Agreement'— *i.e*., the IC Agreement—being referred to arbitration [and] says nothing about arbitrability." Opposition at 2, 10.

While the Court agrees that the sentence would have benefited from a comma after the word "termination," it does not find the delegation of arbitrability to be unclear simply because the word "arbitrability" is not used.  Moreover, the sentence clearly states that disputes related to the validity of the IC Agreement are subject to arbitration and the arbitration provision itself is part of the IC Agreement.  Therefore, the Court finds that the delegation to the arbitrator of the gateway questions under the FAA is clear and unmistakable under this provision.

This conclusion finds further support in the fact that the arbitration provision in this case incorporates the rules of the American Arbitration Association ("AAA").  The Ninth Circuit has observed that "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp. A.G*., 724 F.3d 1069, 1074 (9th Cir. 2013).  Thus, it held in *Oracle* that "as long as an

12

arbitration agreement is between sophisticated parties to commercial contracts, those parties shall

be expected to understand that incorporation of the UNCITRAL[8] rules delegates questions of

arbitrability to the arbitrator." *Id.* at 1075.  Further, the Ninth Circuit made clear in *Brennan v.*

*Opus Bank*, that this rule does not "require that the contracting parties be sophisticated or that the

contract be 'commercial' before a court may conclude that incorporation of the AAA rules

constitutes 'clear and unmistakable' evidence of the parties' intent." 796 F.3d 1125, 1130 (9th Cir.

2015).  The Court finds that here, the incorporation of the AAA language, in combination with

clear delegation language in the arbitration provision itself, establishes that the "clear and

unmistakable" requirement is met regardless of Harris's sophistication and even though his

agreement with ERA was not "commercial."

ii.  Is it Unconscionable?

"[U]nder the FAA, where an agreement to arbitrate includes a delegation clause, if a party

challenges specifically the enforceability of the delegation clause, the district court must consider

the challenge, but if a party challenges the enforceability of the arbitration agreement as a whole,

the challenge is for the arbitrator." *Saperstein v. Thomas P. Gohagan & Co*., 476 F. Supp. 3d 965,

975 (N.D. Cal. 2020) (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 66 (2010)).  Here,

Harris brings a specific challenge to the delegation provision in the IC Agreement's arbitration

provision, arguing that it is unconscionable under California law.  To the extent he relies on

California law to show the delegation provision is unconscionable, however, he must establish that

California law applies to that question despite the choice of law provision in the IC Agreement

specifying that the agreement "shall be construed and interpreted in accordance with the laws of

the state of Texas except for its conflict of law's provisions."  IC Agreement ¶ 15; *Green Tree Fin.*

*Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000) ("The party resisting arbitration bears the

burden of proving that the claims at issue are unsuitable for arbitration.").  Having considered the

supplemental briefing and evidence submitted by the parties on the choice of law question, the

---

[8] The Ninth Circuit explained in *Oracle* that "[t]he AAA rules contain a jurisdictional provision similar to Article 21(1) of the 1976 UNCITRAL rules and almost identical to Article 23(1) of the 2010 UNCITRAL rules." *Id.* at 1074.

United States District Court
Northern District of California

1    Court concludes Harris has not met that burden.

2        *Legal Standards*

3        Where, as here, the arbitration provision also includes a choice of law provision, a district

4    court applies the choice of law rules of the state where the court sits to determine if that provision

5    should be enforced. *See Saravia v. Dynamex, Inc*., 310 F.R.D. at 418.  "Under California law, a

6    contractual choice-of-law provision should be enforced if: (i) the chosen state's law has a

7    'substantial relationship' to the parties or the transaction, (ii) the forum state has no 'fundamental

8    policy' that is inconsistent with the chosen state's law, and (iii) even if such a fundamental conflict

9    exists, the provision should nevertheless be enforced unless the forum state has a 'materially

10   greater interest' in the resolution of the matters at issue." *Id.*  at 419 (quoting *In re Vortex Fishing*

11   *Sys., Inc*., 277 F.3d 1057, 1069 (9th Cir. 2002);  *see also Nedlloyd Lines B.V. v. Superior Court*, 3

12   Cal. 4th 459 (1992) (setting forth test under California law for enforcing contractual choice of law

13   provision).

14       The *Nedlloyd* analysis adopts "the principles set forth in Restatement section 187, which

15   reflects a strong policy favoring enforcement of" "arm's-length contractual choice-of-law

16   provisions." 3 Cal. 4th at 464-465.  Section 187 provides, in relevant part, as follows:

17   (1) The law of the state chosen by the parties to govern their
         contractual rights and duties will be applied if the particular issue
18       is one which the parties could have resolved by an explicit
         provision in their agreement directed to that issue.

19
     (2) The law of the state chosen by the parties to govern their
20       contractual rights and duties will be applied, even if the particular
         issue is one which the parties could not have resolved by an
21       explicit provision in their agreement directed to that issue, unless
         either

22
         (a) the chosen state has no substantial relationship to the parties
23           or the transaction and there is no other reasonable basis for the
             parties' choice, or

24
         (b) application of the law of the chosen state would be contrary to
25           a fundamental policy of a state which has a materially greater
             interest than the chosen state in the determination of the
26           particular issue and which, under the rule of § 188, would be
             the state of the applicable law in the absence of an effective
27           choice of law by the parties.

28           . . .

1    Restatement (Second) of Conflict of Laws § 187 (1971).  Section 188, in turn, provides, in

2    relevant part:

3              (2) In the absence of an effective choice of law by the parties (see §
                  187), the contacts to be taken into account in applying the

4              principles of § 6 to determine the law applicable to an issue
                  include:

5                  (a)  the place of contracting,

6                  (b)  the place of negotiation of the contract,

7                  (c)  the place of performance,

8                  (d)  the location of the subject matter of the contract, and

9                  (e)  the domicil, residence, nationality, place of incorporation and
                       place of business of the parties.

10

11             These contacts are to be evaluated according to their relative
               importance with respect to the particular issue.

12   Restatement (Second) of Conflict of Laws § 188(2) (1971).

13          The California Supreme Court has  explained that "Courts and legal writers usually

14   distinguish 'domicile' and 'residence,' so that 'domicile' is the one location with which for legal

15   purposes a person is considered to have the most settled and permanent connection, the place

16   where he intends to remain and to which, whenever he is absent, he has the intention of returning,

17   but which the law may also assign to him constructively; whereas 'residence' connotes any factual

18   place of abode of some permanency, more than a mere temporary sojourn."  *Smith v. Smith*, 45

19   Cal. 2d 235, 239 (1955).  "'Domicile' normally is the more comprehensive term, in that it includes

20   both the act of residence and an Intention to remain; a person may have only one domicile at a

21   given time, but he may have more than one physical residence separate from his domicile, and at

22   the same time."  *Id.*

23          <u>*Whether Texas Has a Substantial Relationship to the Parties or Transaction*</u>

24          ERA contends it has its principal place of business in Texas and therefore, that Texas has a

25   "substantial relationship" to the parties under *Nedlloyd*.  Dkt. 68 (Worley/ERA Supp. Brief) at 5.

26   The Court agrees.  Under California law, a state has a substantial relationship with a company that

27   "has its principal place of business, corporate headquarters, and operating center" in that state,

28   even if it is incorporated in another state.  *Peleg v. Neiman Marcus Grp., Inc*., 204 Cal. App. 4th

                                                15

1    1425, 1446 (2012).  Defendants have offered the declaration of ERA Regional Director Julie

2    Booth stating that ERA is "based out of Texas."  Booth Decl. ¶ 7.  Harris has not offered any

3    evidence to the contrary and does not dispute in his supplemental opposition brief that Texas has a

4    substantial relationship with the parties.  Therefore, the Court finds that the "substantial

5    relationship" requirement for enforcing the choice of law provision is met.

6         *Whether Application of Texas Law Would Contravene a Fundamental Policy of California*

7    *in which California has a Materially Greater Interest Than Texas*

8         As discussed above, under Section 187 of the Restatement (Second) of Conflict of Laws, a

9    choice of law provision will not be enforced where application of the law of the chosen state

10   "would be contrary to a fundamental policy of a state which has a materially greater interest than

11   the chosen state in the determination of the particular issue."  Harris contends application of the

12   Texas choice of law clause in the arbitration provision of the IC Agreement contravenes

13   fundamental public policies of California in several ways.  First, he argues that "California public

14   policy holds that the imposition of substantial forum fees is grounds for invalidating an arbitration

15   agreement[ ]" whereas Texas law  "does not recognize such an imposition as unconscionable."

16   Dkt. 69 (Harris Supp. Opp.) at 7-8 (quoting *Saravia v. Dynamex, Inc*., 310 F.R.D. 412, 419 (N.D.

17   Cal. 2015) (citing *Armendariz v. Found. Health Psychcare Servs., Inc*., 24 Cal.4th 83, 110

18   (2000)).

19        Second, Harris asserts,  California's fundamental policy is at stake because "California law

20   does not permit enforcement of arbitration agreements even after multiple defects have been

21   severed because such an agreement 'indicate[s] a systematic effort to impose arbitration . . . as an

22   inferior forum that works to the employer's advantage[ ]'" whereas Texas would "enforce such a

23   provision as long as 'the parties would have entered into the agreement absent the unenforceable

24   provisions.'"  *Id.* (quoting *Saravia*, 310 F.R.D., at 319 (quoting *D.R. Horton–Texas, Ltd. v.

25   *Drogseth*, 2013 WL 3377121, at *4 (Tex.App., July 3, 2013)).

26        Finally, Harris suggests that to the extent the arbitration provision requires the parties to

27   bear their own attorneys' fees, California's fundamental policy of protecting its workers from

28   discrimination under FEHA – which allows for attorneys' fees to be awarded to a prevailing

United States District Court
Northern District of California

16

1  plaintiff -- is implicated.  *Id.* at 12-13.

2      Assuming that Harris has identified fundamental policies of California that are implicated

3  by application of Texas law to the determination of whether the delegation clause is enforceable (a

4  question the Court does not decide), the Court concludes that the Texas choice of law provision is

5  nonetheless enforceable because under the specific facts of this case, Harris has not demonstrated

6  that California has a greater interest in the application of its law than Texas has.

7      To determine whether California has a materially greater interest than Texas, the court

8  considers the factors set forth in Section 188 of the Restatement (Second) Conflict of Laws,

9  namely, "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of

10  performance, (d) the location of the subject matter of the contract, and (e) the domicil[e],

11  residence, nationality, place of incorporation and place of business of the parties." *Oestreicher v.*

12  *Alienware Corp*., 502 F. Supp. 2d 1061, 1068 (N.D. Cal. 2007), aff'd, 322 F. App'x 489 (9th Cir.

13  2009) (quoting *Application Group, Inc. v. Hunter Group, Inc*., 61 Cal.App.4th 881, 903 (1998)).

14  This inquiry involves a fact-intensive analysis.  *Textron Inc. v. Travelers Cas. & Sur. Co*., 45 Cal.

15  App. 5th 733, 739 (2020), review denied (July 8, 2020).

16      The easiest factor to evaluate is the location of the subject matter of the contract, as it is

17  undisputed that ERA hired Harris to perform inspections of PG&E equipment located in

18  California.  As to the other factors, however, there are gaps and inconsistencies in the evidence

19  that makes these factors somewhat more difficult to evaluate.  As discussed below, the Court's

20  findings as to these factors suggest that California has only a modest interest in the application of

21  its law to the delegation clause of the Arbitration Provision.

22      Although Harris has repeatedly alleged in this case (and in the administrative proceedings)

23  that he is a resident of Louisiana,[9] Harris now says that he has lived "continuously in California

24  since 2019" and that he decided to stay in California permanently in December 2019, when

25  "Worley extended an offer to [him]."  Harris Decl. ¶ 3. He has offered evidence that he paid

26

27  _____

[9] *See* Complaint ¶ 6 ("[Plaintiff] is a resident of the State of Louisiana."); First Amended
Complaint ¶ 13 (same); SAC ¶ 13 (same); SAC, Ex. 4 at ECF p. 31 (DFEH complaint filed
28  8/12/2021 and signed by David Markevitch under penalty of perjury stating that "Complainant
Dexter Harris, resides in the City of Baker, State of Louisiana").

1   monthly rent for part of a house in Danville, California for the period September 2019 through

2   December 2021, where he received some Amazon deliveries, and a copy of a text to his landlord

3   in December 2019 letting her know that he wanted to extend the rental through 2020. *Id.* ¶ 3 &

4   Exs. 3-5. Harris also states in his declaration that he currently lives at an address in Hayward,

5   California, and that he has "no other domicile other than" his house there. *Id.* ¶ 9. According to

6   Harris, since 2019, he has "been paying California income tax, and CA disability employee tax."

7   *Id.* ¶3. To support this representation, he offers a pay statement from his current employer dated

8   October 7, 2022, showing that he is now paying California taxes. *Id.* Exs. 2, 3.

9        Harris has not, however, provided California tax returns for 2020 or copies of his pay

10   statements for the period he worked for Worley and PG&E showing that he paid California taxes

11   on his earnings from that work. Nor has he provided any evidence that he registered his vehicle in

12   California or obtained a California driver's license. These omissions cast serious doubt on his

13   assertions that he not only resided in California in 2020 but also was domiciled here. *See* Harris

14   Supp. Opp. at 9. Harris's communications with Defendants and statements in his DFEH

15   complaint also conflict with that assertion.

16        For example, Harris's DFEH Charge, filed February 9, 2021, lists his address as 6325

17   Bentley Drive, Baker, La. 70714. SAC, Ex. 4 at ECF p. 41. Even more troubling, though, is the

18   following passage in the fact section of the charge:

19        Due to what I deemed an unusual long delay in receiving the start date
          I contacted Mr. Issam Al-Ayadi of P.G.& E. giving notice of my being
20        in California as of 3/12/20 and the signing of a work contract as of
          3/26/20 with their business partner Worley and my mounting
21        financing hardship due to delay in starting work, hotel, daily needs,
          travel expense. He responded that I should go home to Louisiana, to
22        which I replied that I had driven to California and the state of
          California had in place a state wide travel ban with fines up to 1000
23        dollars and [penalties] up to 6 months in jail for violations.

24   *Id.* This passage strongly suggests that even though Harris may have paid rent for a room in

25   California starting in December 2019, he did not reside in California during most (or all) the

26   period he was negotiating the IC Agreement, that is, between December 2019, when he says

27   Worley offered the position to him, and March 26, 2020, when he alleges he was hired by Worley.

28   Instead, it appears he was in Louisiana for most of that time, which he still considered his primary

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1   residence and domicile.  This conclusion is further supported by his complaint in the DFEH

2   charge that he should have been paid a per diem for his work for PG&E because he was an "out-

3   of-state" employee."  *Id.* This evidence seriously undermines his attempt to establish California

4   domicile based on his professed intent to stay dating back to December 2019.

5           The evidence concerning the place where Harris performed the work for Worley and

6   PG&E also contradicts Harris's prior allegations.  In the SAC (and all prior versions of the

7   Complaint), Harris alleged that he was hired "to perform high voltage energy transmission

8   inspections and other related work for Worley and . . . [PG&E] *in California*."  SAC ¶ 22

9   (emphasis added); *see also* First Amended Complaint ¶ 21; Complaint ¶ 13.  To the extent there

10  was any room for doubt, counsel insisted at the August 26, 2022 motion hearing that Harris's only

11  remote work involved Teams meetings with PG&E employees and that the actual inspections of

12  PG&E equipment were *not* performed remotely.  Transcript of August 26, 2022 hearing at 16-17

13  ("[T]he work itself, and my understanding and the way it is alleged in the complaint, was that [it]

14  was] on location in California and he had to live here, hence the per diem payments.")

15          The evidence that the parties have now presented, however, indicates that the parties

16  understood that the work Harris would perform for PG&E would be "100% remote for the entire

17  project from our homes."  Wilson Decl., Ex. A (April 15, 2020 email from Harris asking that

18  contract be updated to reflect this understanding).  Further, the uncontroverted evidence is that

19  other than coming to pick up his work-issued computer, Harris in fact worked entirely remotely, as

20  did all of the other PG&E inspectors during this time period, and was never instructed to come to

21  California.  Harris Decl. ¶¶ 14-15; Ayadi Decl. ¶¶ 3-4; Ortiz Decl. ¶¶ 3-4. Further, Harris's

22  supervisors at PG&E stated in their declarations that did not know *where* Harris was when he

23  performed his work for PG&E and had no reason to know or care.  Ayadi Decl. ¶ 4; Ortiz Decl. ¶

24  4.

25          Based on the evidence discussed above, the Court concludes that the IC Agreement was

26  negotiated mostly in Texas (where Defendants are based) and Louisiana even though Harris may

27  have been in California for a short period of time at the tail end of negotiations.  It further

28  concludes that although Harris may have maintained a residence in California during the period in

United States District Court
Northern District of California

1    which he worked for PG&E and Worley, in 2020, he was not domiciled in California during that

2    period and continued to treat Louisiana as his primary residence.  Finally, even assuming Harris

3    was residing in California and performing his (remote) work here, the fact that he may have been

4    here rather than in some other state was fortuitous in the sense that nothing about the work

5    assignment *required*  Harris to be here; rather, the work he performed could have been performed

6    anywhere.

7           Under these circumstances, Harris has not demonstrated that California has a greater

8    interest than Texas does with respect to any policy that may be implicated by application of the

9    Texas choice of law clause in the IC Agreement arbitration provision. Therefore, the Court finds

10   that under *Nedlloyd*, the Texas choice of law provision is enforceable.  As Harris has not argued

11   that the delegation clause is unconscionable under Texas law (despite the Court's invitation to

12   address that question in its August 26, 2022 minute order, dkt. 63) or pointed to any authority in

13   support of that conclusion, the Court further finds that the delegation clause is enforceable. As

14   such, the gateway issues raised by Harris in opposing arbitration are properly decided by the

15   arbitrator and not the Court.

16      **C.  Whether Claims Against Worley are Subject to Arbitration**

17           In the Worley/ERA Motion, both defendants seek to compel arbitration even though

18   Worley was not a party to the IC Agreement.  The Court finds that the claims asserted against

19   Worley, like the claims asserted against ERA, are subject to arbitration for the reasons set forth

20   below.[10]

21           As a preliminary matter, the Court again is faced with a choice of law question.  In general,

22   "a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if

23   the relevant state contract law allows the litigant to enforce the agreement."  *Kramer v. Toyota*

24   *Motor Corp*., 705 F.3d 1122, 1128 (9th Cir. 2013).  Here, however, the question of *which* state's

25   law arises because of the choice of law provision in the IC Agreement providing that that

26   agreement is to be "construed and interpreted in accordance with" Texas law.   The Court

27

28   ---

[10] The Court notes that Harris did not address this question in his briefs or challenge Defendants'
assertion that the arbitration provision applies to his claims against all three defendants.

United States District Court
Northern District of California

1    concludes that that provision, on its face, does not extend to a nonsignatory's attempt to enforce an

2    arbitration agreement against a signatory.  The Court further notes that Worley has not argued that

3    Texas law applies to this question or identified any differences between California and Texas

4    contract law on this issue.  Moreover, PG&E (the only party to address the question under Texas

5    law) cited authority suggesting that the relevant state law is the same whether the Court applies

6    California or Texas law. PG&E Motion at 8 (citing *Trujillo v. Volt Management Corp.*, 2020 WL

7    1906097, *5 (W.D. Tex. Apr. 17, 2020), aff'd 846 Fed. Appx. 233 (5th Cir. 2021)). Therefore, the

8    Court applies California law to the question of whether Worley can enforce the arbitration

9    provision against Harris with respect to the claims Harris asserts against it in this case.

10        "General contract and agency principles apply in determining the enforcement of an

11   arbitration agreement by or against nonsignatories."  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d

12   1042, 1045 (9th Cir. 2009) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)).

13   "'Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-

14   piercing/alter ego; and 5) estoppel.'" *Id.* (quoting *Comer v. Micor, Inc.*, 436 F.3d at 1101) (internal

15   quotations and citation omitted).  "A nonsignatory also can seek to enforce an arbitration

16   agreement as a third party beneficiary." *Id.* (citation omitted).

17        Although ERA and Worley assert in their briefs that Worley is a third-party beneficiary of

18   the Arbitration Provision, they have not made any attempt to show that the arbitration provision in

19   the IC Agreement was "made expressly for the benefit of [Worley][,]" as is required under

20   California law.  *See* Cal. Civ. Code § 1559.  California courts interpret the word "expressly" as the

21   negative of "incidentally." *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004

22   (2009). Thus, "it is not enough that the third party would incidentally have benefited from

23   performance. . . . The contracting parties must have intended to confer a benefit on the third

24   party." *Id.* (citation and internal quotation marks omitted). While it is not inconceivable that

25   Worley is, in fact, an intended beneficiary of the arbitration provision in the IC Agreement, it has

26   not demonstrated as much having failed to address (or even identify) the relevant legal standards

27   that govern that question.

28        Nonetheless, the Court finds that Worley can enforce Harris's arbitration agreement with

21

United States District Court
Northern District of California

ERA under the doctrine of equitable estoppel.  "California law . . . allows a nonsignatory to invoke arbitration under the doctrine of equitable estoppel even when a signatory 'attempts to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants.'" *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870–71 (9th Cir. 2021) (citing *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal.App.4th 1705, 1713 (2003) (quotation marks and citation omitted)). In determining whether this doctrine applies, courts "look to 'the relationships of persons, wrongs and issues,' and in particular, whether the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Id*. (quoting *Metalclad*, 109 Cal. App. 4th at 1713).

In *Franklin*, the plaintiff was a nurse who had entered into an arbitration and employment agreement with a staffing agency and asserted claims under the California labor code against the hospital where the staffing agency had assigned her to work.  998 F.3d at 869.  Although the hospital was not a signatory to the agreement, the court found that under California law, "[the] signatory employee's claim against [the] nonsignatory client of the staffing agency [was] 'intimately founded in and intertwined with' the employment contract." *Id.* at 871.  In reaching this conclusion, the court relied on *Garcia v. Pexco, LLC*, 11 Cal.App.5th 782 (2017), which it found to be an accurate statement of California law and consistent with Ninth Circuit precedent on equitable estoppel.  *Id.* at 871-873.

In *Garcia v. Pexco*, the plaintiff asserted claims under the California Labor Code against the staffing agency that hired him (Real Time) and the nonsignatory client for whom he performed work (Pexco) on a joint employer theory.  11 Cal. App. 5th at 789.  The court found that the claims against Pexco were "intimately founded in and intertwined with" his employment contract with Real Time.  *Id.* at 796-97.  In reaching that conclusion, the court rejected the plaintiff's argument that the claims were not "sufficiently 'intertwined' with the underlying arbitration agreement" because he asserted statutory claims against Pexco, observing that "a claim 'arising out of' a contract does not itself need to be contractual."  *Id.* at 787 (citing *Coast Plaza Doctors Hospital v. Blue Cross of California*, 83 Cal.App.4th 677, 685-686 (2000)).

1
2
3
4
5
6
7
8
9
10
11
12

United States District Court
Northern District of California

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, as in *Garcia*, Harris asserts his claims against ERA and Worley as joint employers and bases all of his claims against ERA and Worley on the same set of facts.  Further, Worley is described as the "client" in the draft IC Agreement supplied by Harris as an attachment to his SAC.   The one apparent difference between this case and *Garcia* is that the arbitration provision here, in contrast to the one in *Garcia*, does not expressly state that it covers the statutory claims that are asserted in this case. Harris, however, has not argued that his claims – as to ERA or Worley -- are outside of the scope of the arbitration provision.  Furthermore, any challenge on this basis as to his claims against ERA have been delegated to the arbitrator to decide; the principles that underly the equitable estoppel doctrine support the conclusion that such challenges as they relate to Harris's claims against Worley should therefore also be decided by the arbitrator.  In particular, to the extent Harris's claims against ERA and Worley are essentially the same, it would be unfair for the Court to decide this gateway issue as to Worley when it must be arbitrated as to his claims against ERA.  Therefore, the Court finds that Worley is entitled to enforce the arbitration provision as to the claims Harris asserts against it.

### D.   Whether Claims Against PG&E are Subject to Arbitration

PG&E also seeks to enforce the Arbitration Provision against Harris, arguing that under both California law and Texas law, Harris's claims against PG&E should be compelled into arbitration "given that Plaintiff has brought the exact same claims and theories against both ERA and PG&E" and Harris claims that PG&E acted in unison with ERA.  PG&E Motion (dkt. 46) at 8 (citing *Garcia v. Pexco, LLC*, 11 Cal. App. 5th 782, 788 (2017);  *Trujillo v. Volt Management Corp.*, 2020 WL 1906097, *5 (W.D. Tex. Apr. 17, 2020), aff'd 846 Fed. Appx. 233 (5th Cir. 2021)).  In his opposition brief (dkt. 57), Harris incorporates his arguments in opposition to the Worley/ERA Motion that the arbitration agreement should not be enforced because it is unconscionable, but he does not dispute that PG&E acted in unison with signatory ERA or challenge PG&E's assertion that the claims against it are so intertwined with those that are asserted against ERA that they must be arbitrated under the doctrine of equitable estoppel.

The Court finds that under the doctrine of equitable estoppel, the Arbitration Provision is binding with respect to Harris's claims against PG&E.

## IV.    CONCLUSION

For the reasons stated above, the Motions are GRANTED to the extent ERA, Worley and PG&E seek to compel arbitration.  The Court finds that Harris's claims, including his challenges on gateway issues of arbitrability, are subject to arbitration under the arbitration provision of the IC Agreement.  Therefore, the Court dismisses this case, in its entirety, without prejudice under Rule 12(b)(1) for lack of subject matter jurisdiction.  The Clerk is instructed to enter judgment stating that the case has been dismissed without prejudice and close the case.

**IT IS SO ORDERED.**

Dated:  November 2, 2022

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California